IN THE UNITED STATES DISTRICT COURT
FOR NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK USER ID **100041250683007** THAT IS STORED AT PREMISES CONTROLLED BY FACEBOOK INC. | Case No. 21-mj-<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, John Forte, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), United States Department of Justice, and have been so employed since 2002. I am currently assigned to the ATF Boston Field Division, Manchester, New Hampshire Field Office, and charged with investigating criminal offenses involving the federal firearms, explosives, arson, alcohol, and tobacco diversion laws.

3.      I have received extensive training in the federal firearms laws and am familiar with ATF's regulations regarding the purchase and sales of firearms.  I have successfully completed the Criminal Investigations Training Program and the ATF New Professional Training (NPT) at the Federal Law Enforcement Training Center in Glynco, GA.  During the NPT program, I learned how to investigate criminal offenses involving the federal firearms, explosives, arson, alcohol, and tobacco diversion laws.  I have received advanced training with regard to conducting complex firearms trafficking investigations.  I have participated in dozens of investigations relating to the illegal acquisition and sales of firearms, the illegal manufacture and possession of National Firearms Act weapons and previously have sworn out numerous affidavits in support of search warrants and arrest warrants in firearms cases.  I have been certified as an Interstate Nexus Expert, that is, an expert in establishing whether particular firearms or ammunition have traveled in interstate commerce thereby satisfying the interstate commerce element of many federal firearms crimes.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. §922(u) Theft of Firearms from a Federal Firearms Licensee, Title 18 U.S.C. §922(g)(1) Felon in Possession of a Firearm, Title 18 U.S.C. §922(g)(3) User of Controlled Substances in Possession of a Firearm, and Title 21 U.S.C. §841(a)(1) Distribution and Possession with Intent to Distribute Controlled Substances have been committed by Derek HACKETT.  There is also probable cause to search the

information described in Attachment A for evidence of these crimes as described in Attachment B.

## PROBABLE CAUSE

### BOSSMAN OUTDOORS FIREARMS THEFT

6.  Detective Teighlar Hendrick of the Haverhill, NH Police ("HPD"), and Corporal Michael DiDomenico of HPD have told me and S/A Dawley the following information:  On April 5, 2021, at approximately 6:23 AM, HPD responded to a burglary alarm at 24 Railroad Street, Woodsville, NH.  The building located at 24 Railroad Street contains two separate businesses to include a restaurant, Iron Rail Pub & Grill (hereinafter, the "Iron Rail") and a Federal firearms licensee, Bossman Outdoors (hereinafter, the "FFL").  The Iron Rail and the FFL have a common basement, separated by a metal door, into two distinct storage areas for each business. On April 5, 2021, upon arrival at the building at approximately 6:28 AM, HPD personnel observed signs of forced entry through the top half of a double-hung exterior door on the basement level. The door was determined to lead into the Iron Rail storage area of the basement. HPD personnel immediately observed a partial footprint located on a speaker box just inside of the broken door, as well as broken door latches.

7.  We also learned from HPD that HPD personnel proceeded to check the building for occupants, but none were located. HPD did, however, locate a box of 5,000 rounds of .22 Long Rifle caliber Armscor Ammunition on the Iron Rail side of the basement, near the metal door that separates the two sides of the basement. HPD personnel also located a moving dolly, containing an additional box of 5,000 rounds of .22LR caliber Armscor Ammunition and two (2) boxes of 5,000 rounds of .22LR caliber Aguilar Ammunition. HPD confirmed was Bossman

Outdoors store employees that no employees had not loaded the aforementioned ammunition onto the dolly.

8.      Through conversations with involved law enforcement, store employees and through the examination of Iron Rail video surveillance, we learned the following: On or about April 5, 2021 at approximately 6:13:19 AM, according to the timestamp[1] on the video surveillance, an unknown white male, approximately in his 20's or 30's (hereinafter, "Suspect #2"), dressed in a black hooded jacket/sweatshirt, black pants, light colored shoes with a dark soles, wearing what appear to be gloves, a brimmed hat and a dark backpack with a lighter colored accent, appeared from the southwest driveway of 14 Nelson Street, Woodsville, NH,[2] and crossed Nelson Street onto the northeast delivery driveway located in the rear of the Iron Rail. Suspect #2 covered his face with his hands as he walked by overt exterior cameras attached to the building.



*Figure 1: Suspect #2 – Walking behind 24 Railroad Street*

---

[1] I learned the timestamp for the Iron Rail video surveillance was approximately 3 minutes ahead of the time shown on my government issued smartphone.

[2] 14 Nelson Street is a dwelling that has two driveways – one on the southwest side of the residence and one on the northeast side of the residence.

9.      At approximately 6:14:30 AM, Suspect #2 was observed on video surveillance at the rear door, later found by responding HPD personnel to have been damaged, and Suspect #2 goes out of view of the camera and inside of the building.

10.     At approximately 6:18:35 AM, Suspect #2 was observed opening the interior basement door into the FFL's main showroom. Suspect #2 walked around a glass firearms storage display with an unsecured rifle on top, went to the second rack of unsecured rifles and removed four (4) rifles, later determined to be three (3) Excel Arms X-22R .22 caliber rifles (serial numbers 110325, 110326, 110329) and one (1) Mossberg 715T .22 caliber AR-variant rifle (serial number ESG4317435).

11.     We observed the backpack to appear to contain additional contents than when initially observed in earlier video footage. Suspect #2 exited the first floor back into the basement at approximately 6:19:12 AM.



*Figure 2: Suspect #2 stealing four firearms off FFL rack*

12.     At approximately 6:26:47, Suspect #2 was observed exiting the same exterior door that he originally entered in through, carrying the four (4) rifles and a backpack containing unknown contents. Suspect #2 initially walked down the northeast driveway, abruptly jogged and

crossed Nelson Street and walked up the northeast driveway of 14 Nelson Street, behind the residence and out of view of the cameras.



*Figure 3: Suspect #2 – Leaving 24 Railroad Street with four rifles*

13.     HPD personnel advised me that they believed a cellphone was used by Suspect #2 because Suspect #2 entered a windowless basement with no overhead lights on, and no visible headlamp or flashlight on Suspect #2's person. I observed video surveillance footage, dated April 5, 2021 at approximately 6:17:50 AM, inside of the Iron Rail.  The footage focuses on the first floor of the Iron Rail but I could see a light illuminating various parts of the basement. Based on the shadows and movement of the light, I believe the footage to be consistent with someone walking in the basement using a flashlight.  I personally observed the basement without lights on and was unable to see or navigate without the use of a flashlight. I know through my training, knowledge and experience that most major smartphone cellphones come equipped with a flashlight feature. I also know that most people carry a cellphone on their persons throughout their daily activities, to include during the commission of crimes. I believe it is more likely than not that the suspect would use a cellphone flashlight feature rather than a traditional flashlight, as

a cellphone is more easily explained if encountered by persons or law enforcement, whereas a flashlight could be viewed as a burglarious tool.

### SUSPECT #1 INSIDE BOSSMAN OUTDOORS

14.     S/A Dawley learned through Jason Fullerton Jr. and Bruce Simonds, the sales clerks of the FFL, and through the examination of video surveillance, that on Friday, April 2, 2021 at approximately 1:24 PM,[3] an individual (hereinafter, "Suspect #1") similar in description to Suspect #2 had been a patron at the FFL. S/A Dawley learned that Suspect #1 was considered suspicious by store employees due to the extended time Suspect #1 spent inside of the store without purchasing or holding any items. Mr. Fullerton estimated Suspect #1 was inside of the store for approximately 30 to 45 minutes. Mr. Fullerton stated Suspect #1 was wearing a black backpack with a lighter colored accent with a blue water bottle attached to the side of the backpack. Mr. Fullerton stated Suspect #1's face was covered by a neck gaiter.



*Figure 4: Suspect #1 - Entering FFL on 04/02/2021*

---

[3] I learned the timestamp for the FFL video surveillance was approximately 2 minutes behind the time shown on my government issued smartphone.

15.     Mr. Fullerton stated it was odd that Suspect #1 asked for a Ruger 10-22 .22 caliber rifle and was advised none were in stock. Mr. Simonds showed Suspect #1 an Excel Arms X-22R .22 caliber rifle and a Mossberg 715T AR-variant .22 caliber rifle, and advised Suspect #1 that both rifles accepted Ruger 10-22 magazines. According to Mr. Fullerton and Mr. Simonds, the rifles shown to Suspect #1 were the same rifles stolen during the burglary by Suspect #2.



*Figure 5: Suspect #1 holding .22 caliber rifle*

16.     According to Mr. Fullerton, Suspect #1 attempted to purchase two small folding knives, however stated he did not have his wallet and subsequently left without paying. According to Mr. Simonds, Suspect #1 made mention that he resided within a short walking distance and pointed to the vicinity of 42 Railroad Street, Woodsville, NH (hereinafter, "42 Railroad Street"). S/A Dawley observed the video surveillance and observed Suspect #1 exit the FFL and walk along Railroad Street in front of Iron Rail, while on a cellphone and walked out of view of the camera towards the vicinity of 42 Railroad Street.

17.     I know that members of criminal groups often communicate via smartphone cellphones to plan and organize their activities. I also know that smartphone cellphones often

have the capabilities to hold location data through external providers and on the physical phones themselves.

18.     According to Google Earth, the front door of the FFL and the front door of 42 Railroad Street are approximately 475 feet apart:



19.     On April 5, 2021, I learned from Jeffrey Elliot, the owner of the building located at 24 Railroad Street, that on April 2, 2021 at approximately 12:00 PM, he observed a male in a black jacket chopping wood in front of 42 Railroad Street. Mr. Elliot stated he had remotely observed video surveillance footage from the burglary and stated the male he observed chopping wood "resembled" Suspect #2.

## 42 RAILROAD STREET, WOODSVILLE, NH

20.     I learned from Detective Hendrick and Corporal DiDomenico that the route of travel by Suspect #2, both arriving and leaving the scene of the crime was down both driveways of 14 Nelson Street. According to Corporal DiDomenico, both routes would converge on a path that lead directly to the backyard of 42 Railroad Street. ATF SA Dawley and I walked the routes

traveled by Suspect #2 and observed a wooded area, accessible by foot where a blue tarp is

readily observed. According to Corporal DiDomenico, the blue tarp is located in the backyard of

42 Railroad Street. S/A Dawley later confirmed via video surveillance that any person attempting

to access the roadway from behind 14 Nelson Street would likely be recorded via exterior video

cameras unless they traveled in the wooded area that lead to the rear of 42 Railroad Street.



21.      Detective Hendrick and Corporal DiDomenico stated the address of 42 Railroad

Street is a commonly visited address for calls for service by HPD. Numerous recent

investigations and arrests have occurred at 42 Railroad Street, to include but not limited to:

medical calls such as drug overdoses, suspicious persons, drug activity and welfare checks.

22.      Corporal DiDomenico and I reviewed body camera footage of Corporal

DiDomenico's route of travel and response to the burglary alarm at 24 Railroad Street on April

5, 2021. Corporal DiDomenico drove past 42 Railroad Street via Central Street (NH-Route 302),

which runs parallel with Railroad Street. Corporal DiDomenico had an unobstructed view of the

residences on Railroad Street between Highland Street and Nelson Street and stated he did not

observe any persons walking in the area. Based upon the lack of persons walking in the area, I

believe it is more than likely that Suspect #2 traveled behind 14 Nelson Street and through the wooded path, which would lead Suspect #2 to the rear of 42 Railroad Street.

### SOURCE OF INFORMATION #1

23.     On April 6, 2021 at approximately 6:30 AM, HPD Corporal DiDomenico arrested Source #1 for possession of controlled substances. During the arrest, Corporal DiDomenico asked Source #1 if they wished to speak to investigators regarding the stolen firearms. ATF SA Dawley and I spoke with Source #1 at the HPD booking room, where Corporal DiDomenico read and provided Source #1 with a Miranda Form prior to being interviewed. Source #1 stated they understood their rights and wished to speak to investigators.

24.     Source #1 wished to cooperate and provide information to law enforcement to seek favorable consideration for pending felony possession of controlled substance charges. According to Corporal DiDomenico, Source #1 had never previously cooperated with law enforcement. According to Source #1, they wished to provide information due to the fact that firearms were stolen and it was plausible that the firearms could be used against Source #1 or their associates in a drug-related robbery and/or against law enforcement such as Corporal DiDomenico or ATF agents investigating the burglary.  Based on my personal interaction with Source #1, I found Source #1 to be candid and credible.

25.     Source #1 has the following criminal convictions:

    a.  Forgery (Felony) – Convicted 10/02/2015

    b.  Theft – Unauthorized Taking – Convicted 10/02/2015

    c.  Violation of Probation – Convicted 08/18/2016

    d.  Theft – Unauthorized Taking – Conviction 05/31/2018

e.  Receiving Stolen Property (Felony) – Convicted 07/05/2018

f.  Violation of Protection Order – Convicted 10/22/2020

26.     Source #1 advised investigators they visited 42 Railroad Street on April 5, 2021.
Source #1 advised they spoke to Peter SMITH, the owner of the property. According to Source
#1, SMITH stated "shit had happened at the residence" in reference to four (4) stolen "22's"
from the FFL. Source #1 stated they spoke with Brandon SWAINE, who stated a male, possibly
by the name of "Nick," had committed the burglary and brought the firearms back to 42 Railroad
Street. I believe "Nick" to be Suspect #2. Source #1 stated they did not know "Nick"/Suspect
#2's true identity and stated "Nick"/Suspect #2 was not at 42 Railroad Street when they were
there. Source #1 was unsure whether the firearms were currently located at 42 Railroad Street,
but believed they were not.

27.     Source #1 stated they had previously lived at 42 Railroad Street for a significant
amount of time in 2020 and 2021. Source #1 stated they were upset with the residents of 42
Railroad Street because their belongings and cash had been stolen while being hospitalized for
drug related complications. Source #1 had intimate knowledge of the residents who lived there,
to include: Peter SMITH, Brandon SWAINE, Crystal TOWLE, Julie ROY, Jordan JOHNSON
and Jonathan JACOB.

28.     I reviewed the criminal histories of the aforementioned residents of 42 Railroad
Street and learned the following persons had the following criminal histories:

a.  Jordan JOHNSON:

i.   Manufacturing Methamphetamine – Convicted 03/07/2017

ii.  Criminal Threatening (Firearm) – Open Case 03/16/2021

iii. Theft by Unauthorized Taking x2 Priors (Felony) – Open Case 03/16/2021

12

      iv.   Willful Concealment x2 Priors (Felony) – Open Case 03/16/2021

  b.  Jonathan JACOB:

      i.   Violation of Probation – Convicted11/18/2003

      ii.   Burglary (Felony) – Unknown Disposition 03/22/2012

      iii.   Receiving Stolen Property (Felony) – Convicted 05/01/2014

      iv.   Burglary (Felony) – Convicted 05/01/2014

      v.   Forgery (Felony) – Convicted 05/01/2014

      vi.   Bail Jumping (Felony) – Convicted 05/01/2014

      vii.   Theft by Deception x2 Prior (Felony) – Convicted 05/01/2014

      viii.   Violation of Probation (Felony) – Convicted 08/10/2017

  c.  Julie ROY

      i.   Possession of Heroin/Crack Cocaine – Open Case

  d.  Brandon SWAINE

      i.   Two (2) active State of New Hampshire Electronic Bench Warrants

## **SOURCE OF INFORMATION #2**

29.     On March 26, 2021 at approximately 12:35 PM, New Hampshire Information &

Analysis Center (NHIAC) Intelligence Officer John Lepkowski took a report from Source #2 on

the "See Something, Say Something" Tip Line. Source #2 provided their identity to Officer

Lepkowski and provided the following information: On or about March 26, 2021, Source #2 was

eating at the Iron Rail and observed Crystal TOWLE walk up to a blue colored Jeep Liberty

bearing an unknown registration, make what is described as a hand-to-hand transaction, which

lasted approximately a few seconds, and walked away. Source #2 recognized Crystal TOWLE

because they lived in close proximity of each other, in or around 42 Railroad Street. Source #2

stated they believed TOWLE was involved in distributing methamphetamine. According to the

tip, Source #2 described Crystal TOWLE as living in a camper/trailer located on Railroad Street.

On April 5 and 6, 2021, I observed a large camper parked on the front lawn of 42 Railroad

Street.

30.    On April 6, 2021, Detective Hendrick spoke with Source #2 via telephone. Source

#2 stated they knew Crystal TOWLE and Brandon SWAINE lived at 29 Railroad Street,

Apartment #3 from approximately October 2020 until December 2020. Source #2 stated they

knew that Crystal TOWLE and Brandon SWAINE now lived at the house with the camper on the

front lawn and "trash all over," which investigators readily identified as 42 Railroad Street.

Source #2 stated during the duration that Crystal TOWLE and Brandon SWAINE lived at 29

Railroad Street, Apartment #3, they observed both parties make hand-to-hand transactions

approximately fifteen to sixteen times. Source #2 stated they believed the hand-to-hand

transactions were drug related based upon knowing Crystal TOWLE and Brandon SWAINE

were heavy drug users, based upon their actions and based upon their life experience and general

knowledge of what they perceived to be drug transactions.

31.    Source #2 stated they had observed a white male with a "scraggily beard and dark

hair," who always had a black backpack who lived on the property of 42 Railroad Street. Source

#2 stated they had observed the unknown male frequent, and possibly live at 42 Railroad Street

for approximately three months.

32.    S/A Dawley ran Source #2's criminal history, and there were no records on file.  I

am not aware of any pending charges against Source #2, and Source #2 was not cooperating to

receive consideration for pending charges and was not being paid for providing information.  I believe Source #2 provided information to law enforcement simply as a concerned citizen.

## FEDERAL SEARCH WARRANT – 42 RAILROAD STREET

33.     On April 7, 2021, at approximately 7:00 AM, S/A Dawley applied for and was granted a Federal search warrant for 42 Railroad Street by the Honorable Judge Johnstone of the District of New Hampshire. On the same day at approximately 2:00 PM, the Federal search warrant was executed at 42 Railroad Street, where ammunition, firearms accessories, drug paraphernalia, a cellphone and articles of clothing were located.

## SOURCE OF INFORMATION #3

34.     During the execution of the Federal search warrant on April 7, 2021, Source #3 was located inside of the recreational vehicle located at 42 Railroad Street and was temporarily detained. Source #3 was advised they were not under arrest. Source #3 stated that they wished to cooperate and provide information to law enforcement to distance themselves from any involvement in the FFL burglary and to seek favorable consideration for possible felony possession of drugs and firearms charges.  This also included Source #3 written consent to search the vehicle he was in possession of and his cell phone. HPD Corporal DiDomenico and I learned the following information during our interview of Source #3:

35.     Source #3 stated a male known to them as "Derek Jenkins," identified as Derek HACKETT, and his girlfriend, later identified as Nichole CLOUTIER, had stayed at 42 Railroad Street on the evening of April 4, 2021. HACKETT and CLOUTIER were sleeping in the smaller camper in the backyard of 42 Railroad Street.

15

36.     Source #3 showed me the Facebook profile of "Derek Jenkins" and consented to a review of Facebook conversations between the two of them. The conversations contained contents related to drug sales from HACKETT to Source #3. The following are some message excerpts from Source #3 and HACKETT's Facebook Messenger conversations:

- On February 25, 2021, Source #3 wrote "Gonna need soon" and HACKETT responded "Kk how much".

- On February 24, 2021, HACKETT messaged Source #3 in two messages; "You guys no anyone looking" and "I can do em for 80 if ya no anyone looking".

- On February 18, 2021 at approximately 0302 hours, HACKETT messaged Source #3 "In white river…..she reupping then going to u" and Source #3 responded "K please we take a bunny".

37.     Source #3 stated they purchased heroin from HACKETT approximately ten times, including on April 4, 2021 and that they communicated with HACKETT via Facebook since at least February 13, 2021.  Source #3 said that they often used Facebook to arrange the drug transactions, and I was able to corroborate this based on my review of their Facebook conversations. Source #3 stated they were aware HACKETT had Facebook on his cellphone. Source #3 advised law enforcement that HACKETT had left a cellphone in the camper, located in the backyard of 42 Railroad Street.  Source #3 advised the cellphone was now in his vehicle. Source #3 stated that he had a conversation at some point with HACKETT regarding the blue Motorola (model unknown) Smartphone and activating the phone.  Source #3 said he did not know where HACKETT obtained the phone.

38.     During the consent search of Source #3 vehicle, a blue Motorola (unknown model) smartphone was located in Source #3 vehicle.

16

39.     I reviewed the criminal history of Derek HACKETT and observed the following felony convictions:

    a.   Burglary (x 2 counts) – Convicted 03/06/2008

    b.   Grand Larceny – Convicted 03/06/2008

    c.   Burglary – Occupied Dwelling – Convicted 04/16/2010

    d.   Burglary – Occupied Dwelling – Convicted 09/15/2015

    e.   Aggravated Assault – Convicted 09/15/2015

    f.   Domestic Violence Assault – open case (10/30/2020)

40.     HACKETT is legally prohibited from possessing firearms by virtue of his prior felony convictions.

41.     Source #3 stated HACKETT advised them that he had access to firearms and had friends who had firearms, which in hindsight, Source #3 stated they believed HACKETT was talking about committing the burglary and gaining access to firearms.

**SOURCE OF INFORMATION #4**

42.     During the execution of the Federal search warrant, Source #4 arrived on scene and approached law enforcement and voluntarily spoke with myself and HPD Corporal DiDomenico. HPD Corporal DiDomenico and I learned the following information during the recorded interview with Source #4:

43.     Source #4 identified HACKETT and CLOUTIER by their Facebook profiles.

44.     Source #4 advised that they had heard "Derek Jenkins" was known as "Hackett", but did not know his real name.

45.     Source #4 stated they knew HACKETT and CLOUTIER for approximately a few weeks.

46.     Source #4 stated HACKETT and CLOUTIER both used methamphetamine and "dope," which through my training, knowledge and experience, I knew to mean heroin/fentanyl. Source #4 stated HACKETT sold heroin.

47.     Source #4 stated HACKETT and CLOUTIER had stayed at 42 Railroad Street for two nights, since approximately April 3, 2021. Source #4 specifically stated HACKETT had overdosed at 42 Railroad Street on April 3, 2021 and that they assisted in reviving HACKETT, without professional medical attention.

48.     Source #4 stated HACKETT approached them inside the residence of 42 Railroad Street on the morning of April 5, 2021 and asked them to burn a black backpack without providing a reason as to why. Source #4 stated later in the morning they walked to deliver a coffee and while on Nelson Street they were approached by Corporal DiDomenico in regards to the burglary that had occurred at the gun store, which I know to be Bossman Outdoors.

49.     Upon returning to 42 Railroad Street later that morning, Source #4 observed HACKETT inside of the kitchen of the residence and confronted him by saying something to the effect "I know what you did, take your backpack and leave" and specified to HACKETT that they knew HACKETT committed the gun store burglary. According to Source #4, HACKETT denied any involvement and subsequently left the residence.

50.     Source #4 stated they followed HACKETT out of the residence shortly after the confrontation. Source #4 followed HACKETT into a "black jeep Cherokee," described to have a Vermont registration. Source #4 stated CLOUTIER was operating the Jeep and that HACKETT was a front passenger. Source #4 stated to HACKETT "I know you did the burglary." According

to Source #4, HACKETT laughed, and HACKETT neither confirmed nor denied his

involvement.

51.     S/A Dawley learned from New Hampshire State Police ("NHSP") Trooper

Timothy Larrabee and Piermont, NH Police Chief Brandon Alling that HACKETT was a suspect

in a car theft ring operating in New Hampshire and Vermont.

52.     S/A Dawley learned through conversation with Windsor, VT Police Sergeant

Detective Kevin Blanchard, HPD Corporal DiDomenico and reviewed the associated WPD and

HPD reports, that on April 3, 2021, a 2016 gray Jeep Compass, bearing Vermont registration

HYB739 was reported stolen by the registered owner, Ashley Hall. According to the reports, Ms.

Hall stated she provided the vehicle to CLOUTIER and HACKETT and had done so on previous

occasions. Ms. Hall contacted HPD directly and advised HACKETT lived in Woodsville, NH

but could not provide the exact address. According to HPD records and the WPD report, HPD

Officer Mitchell located the vehicle at 42 Railroad Street on or about April 4, 2021.

53.     Source #4 stated on April 6, 2021, at approximately 5:38 PM, CLOUTIER texted

them "hey got work" and "I got work!!!". Source #4 stated "work" was in reference to illegal

drugs.

54.     Source #4 stated on April 6, 2021, at approximately 9:03 PM, they received a

Facebook messenger audio call from CLOUTIER that lasted approximately 1 minute and 22

seconds. CLOUTIER stated they, in reference to CLOUTIER and HACKETT, were in Boston at

a Walmart and needed a ride.

55.     Source #4 stated HACKETT usually wore a dark hooded sweatshirt. I asked

Source #4 what kind of personal protective equipment HACKETT wore in public. Source #4

stated HACKETT wore a neck gaiter. I asked Source #4 regarding what kind of shoes

19

HACKETT wore. Source #4 initially stated white and/or black sneakers and then stated "muck boots".

56.     S/A Dawley ran Source #4's criminal history, and there were no records on file.  I am not aware of any pending charges against Source #4. Source #4 was not being paid for providing information. I believe Source #4 was cooperating with law enforcement to distance themselves from any involvement with the FFL burglary.

57.     On April 8, 2021, I provided ATF intelligence personnel with a screenshot of HACKETT's Facebook account profile page alias under "Derek Jenkins" taken from Source #3 phone.  S/A Forte also provided a screenshot of CLOUTIER's Facebook account profile page located by investigators.  ATF intelligence personnel located the Facebook profile ID# 100041250683007 for Derek HACKETT's Facebook account (https://www.facebook.com/derek.jenkins.54943) under the alias Derek JENKINS.  A preservation request of the account was also submitted and acknowledged by Facebook.

58.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

59.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

60.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

61.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

62.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user

and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

63.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

64.     Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

65.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

66.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

67.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

68.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

69.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

70.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

71.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

72.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may

23

communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

73.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location

24

in posts and Facebook "friends" to locate each other.  This geographic and timeline information

may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account

activity may provide relevant insight into the Facebook account owner's state of mind as it

relates to the offense under investigation.  For example, information on the Facebook account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort

to conceal evidence from law enforcement).

74.     Therefore, the computers of Facebook are likely to contain all the material

described above, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction

information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

75.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

76.     Based on the foregoing, I request that the Court issue the proposed search

warrant.

77.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not

required for the service or execution of this warrant.  The government will execute this warrant

by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

78.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

79.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

/s/ John Forte
John Forte
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: _____
Time: _____                    _____
                                    Hon. Andrea K. Johnstone
                                    United States Magistrate Judge

26

## **ATTACHMENT A**

### **Property to Be Searched**

This warrant applies to information associated with the Facebook user ID 100041250683007 (https://www.facebook.com/derek.jenkins.54943) that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a) All contact and personal identifying information, including 100041250683007**:** full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities January 1, 2021 to Present;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them January 1, 2021 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user January 1, 2021 to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account January 1, 2021 to present;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(p)     All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person

regarding the user or the user's Facebook account, including contacts with support

services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within

14 days of issuance of this warrant.

## II.   Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 U.S.C. §922(u) Theft of Firearms from a Federal Firearms Licensee, Title 18 U.S.C. §922(g)(1) Felon in Possession of a Firearm, Title 18 U.S.C. §922(g)(3) User of Controlled Substances in Possession of a Firearm, and Title 21 U.S.C. §841(a)(1) Distribution and Possession with Intent to Distribute Controlled Substances involving Derek HACKETT since January 1, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Information associated with drug trafficking, including communications to arrange drug transactions, the distribution of controlled substances, the disposition of proceeds of controlled substances, including communications, photos, and videos;

(b) Information related to drug customers and related identifying information;

(c) Types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

(d) Information related to communication with coconspirators and sources of supply or identification of coconspirators including chats, calls, other communications, photos, and videos;

(e) Information associated with the acquisition, possession, and distribution of firearms and ammunition, including communications and photographs;

(f) Information associated with Bossman Outdoors, a Federal Firearms licensee;

(g) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and

4

events relating to the crime under investigation and to the Facebook account owner;

(h) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(i) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).